*Minute Order Form (06/97)*

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1988 | **DATE** | August 14, 2002 |
| **CASE TITLE** | Nielsen v. Acorn Corrugated Box | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment (doc. #12-1)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial [set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendant's motion for summary judgment (doc. #12-1) is GRANTED. All pending dates and motions are terminated as moot. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 2 1 2002 | |
| | Notified counsel by telephone. | | date docketed | 23 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| JHC | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice / mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



DOCKETED
AUG 21 2002

SANDRA NIELSEN,
    Plaintiff,

v.

ACORN CORRUGATED BOX CO.,
    Defendant.

NO. 01 C 1988

JUDGE WILLIAM J. HIBBLER

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra Nielsen ("Nielsen") filed this lawsuit against her former employer, Defendant Acorn Corrugated Box Company ("Acorn"), alleging retaliation in violation of 42 U.S.C. § 2000e-3 (a)(1), for complaining about sexual harassment. Acorn now moves for summary judgment. The Court has examined the submissions by the parties, and concludes that Nielsen has neither satisfied her threshold burden of establishing a prima facie case, nor rebutted Acorn's legitimate nondiscriminatory reason for its actions. Accordingly, Acorn's motion for summary judgment is granted.

### BACKGROUND[1]

Nielsen began working for Acorn in January 1995 as a switchboard operator. Her primary responsibilities included answering the telephone and directing calls. In January 2000, Acorn decided

---

[1] The facts below are taken from Acorn's Local Rule 56.1(a) statement of undisputed material facts and Nielsen's Local Rule 56.1(b) counter-statement of material facts. In responding to Nielsen's LR 56.1(b) counter-statement, Acorn raised numerous objections to practically every "fact" asserted, and thus neither admitted nor denied the statements. Many of Acorn's objections are valid, as statements of material facts (1) should contain *only* factual allegations, not legal conclusions; (2) should be limited to *material* facts (e.g., this case is not about sexual harassment or gender discrimination); and (3) must be supported by admissible evidence, which hearsay is not. *See generally Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000). However, it would have been more appropriate, albeit inconvenient, for Acorn to attempt to respond to the counter-statement in accordance with LR 56.1(b)(3), and then file a separate motion to strike. Regardless, this Court will limit its consideration to only those material factual contentions that are supported by admissible evidence.

to upgrade its telephone system with voicemail. Because this change reduced Nielsen's workload, Acorn assigned her additional work duties under a new supervisor, Ron Danczyk ("Danczyk"). Nielsen alleges that shortly after she began working for Danczyk, he began to sexually harass her. She complained to Danczyk about his offensive behavior, but when he persisted, she wrote a letter to Phil Goldstein ("Goldstein"), Acorn's President, dated February 22, 2000, informing him of Danczyk's inappropriate conduct. Nielsen says she gave the letter to David Ainsley ("Ainsley"), Goldstein's personal driver who also handled the mail at Acorn. However, Goldstein claims that he did not see Nielsen's letter in February, but some months later. According to Nielsen, the harassment persisted, but she did not attempt to talk to Goldstein or any other member of management about it, as Acorn's February 1994 written sexual harassment policy instructed her to do, because she feared losing her job.

On August 7, 2000, Danczyk and Steve Toffler ("Toffler"), a design manager at Acorn, called Nielsen into a meeting regarding her work assignments. Nielsen was asked if she was willing to be a "team player" to which she responded "definitely." Danczyk then informed Nielsen that she would be getting additional work to do at the switchboard, and that in light of those extra duties, she would no longer be able to do any homework at the switchboard. While working for Acorn, in January 1997, Nielsen had begun attending college part-time in the evenings. Acorn's then Vice-President, Marianne Malaychuck, told Nielsen she could do her homework at her desk when things were slow, so long as she completed her work. After the August meeting with Danczyk and Toffler, though, Nielsen says she only did homework during lunchtime.

In late September 2000, Nielsen's work hours were changed from 7:30 am- 4:00 pm to 8:00 am- 4:30 pm because Goldstein wanted the switchboard to be covered for calls received after 4:00 pm. Nielsen, however, did not like her new hours because most employees left at 4:00 p.m., and thus she was left alone in the building with Danczyk (and a few other employees) between 4:00 and 4:30 pm.

On October 2, 2000, Danczyk suspended Nielsen for one day without pay for doing homework during work hours and for not completing her work assignments. Nielsen maintains that she was suspended in retaliation for threatening to report Danczyk to Roseann Hopkins ("Hopkins"), a member of company management, if he did not stop sexually harassing her. The very next day, on October 3, 2000, Nielsen in fact met with Hopkins and Norine Gomoll, Acorn's Personnel Director, and filed a formal complaint of sexual harassment against Danczyk. An investigation followed and Danczyk admitted making comments of a sexual nature towards Nielsen. Acorn then suspended Danczyk for three days without pay from October 5th through October 7th. Nielsen, however, was not satisfied with that result, so she retained an attorney and filed a charge of discrimination alleging sexual harassment and retaliation with the EEOC. Although the charge is dated October 5, 2000, the EEOC marked it as received on October 24, 2000.

Nielsen contends that after she formally complained of sexual harassment, Acorn retaliated against her in several ways. First, on October 9, 2000, Acorn changed Nielsen's work area. Acorn says it did so as part of an ongoing remodeling project, while Goldstein testified at his deposition that Nielsen's counter was removed so that they could see what she was doing. Prior to the change, the switchboard area had a half-wall around Nielsen's desk. (*See* Pl.'s App. to LR56.1(B) Statement in Opp'n to Def.'s Mot. for Summ. J., Exs. 26, 27 (before and after photographs of Nielsen's work station)). Nielsen maintains her desk was changed because she complained to management about Danczyk. Nielsen concedes she was aware that Acorn had been remodeling its office space, but insists she was told her work area would not be changed. Nielsen described the replacement desk as a "broken down tiny little makeshift desk" that had "dangerous wires all over the place." (Pl.'s 56.1(b) Counter-Statement of Material Facts, ¶¶148-49). She contends the desk was so small and unstable that it

-3-

interfered with her ability to do her job. After Nielsen left Acorn, though, her replacement continued to use the same desk until all switchboard operations were relocated from the first floor (where Nielsen had worked) to the second floor.

Next, Nielsen alleges that on or about October 10, 2000, several co-workers told her Goldstein instructed them not to speak with her or eat lunch with her. However, Goldstein maintains that he only told employees not to hang around the switchboard and to remain at their own desks if they did not have any work to do.

Finally, Nielsen claims she was subjected to false accusations of doing homework at her desk. On October 19, 2000, though, Hopkins actually observed Nielsen doing homework at the switchboard. Hopkins then warned Nielsen not do homework at her desk anymore, even during lunchtime, although she could read while waiting for additional work. On December 5, 2000, Donna Quinlan, another Acorn employee, attests that saw Nielsen doing homework at her desk and told Hopkins. Consequently, on December 6, 2000, Hopkins met with Nielsen and Toffler and told her, once again, to stop doing homework at her workstation during regular work hours. Nielsen responded by denying that she had been doing homework. On December 7, 2000, Goldstein claims he saw Nielsen doing homework at her desk and thus directed Hopkins and Toffler to terminate Nielsen's employment. Nielsen was discharged on that same day.

Nielsen denies doing homework at her desk and maintains that if those accusing her had confronted her at the time, she would have been able to prove otherwise. She also points out that Lori Zygaldo, an Acorn employee who occasionally relieved her at the switchboard during the lunch hour, would read a magazine or do personal things at the switchboard, but was not reprimanded.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary

judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving title is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met the initial burden, to avert summary judgment, the party opposing the motion must go "beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial." *Anderson*, 477 U.S. at 248. The nonmoving party cannot rest on its pleadings, *Weicherding v. Riegel*, 160 F.3d 1139, 1142 (7th Cir. 1998); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920-21 (7th Cir. 1994), nor may that party rely upon conclusory allegations in affidavits, *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir. 1995). However, in determining if a genuine issue of material fact exists, the Court will draw all reasonable inferences in a light most favorable to the non-movant. *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

## ANALYSIS

In *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002), the Seventh Circuit recently clarified the proper standard for analyzing retaliation claims on summary judgment. Previously, a plaintiff had to show that he opposed an unlawful employment practice, and, as a result, was subjected to an adverse employment action. *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000). Proving causation required a plaintiff to demonstrate that his employer would not have taken the adverse action but for the plaintiff engaging in protected activity. *Id.* (quotation omitted).

*Stone* now sets forth two routes to summary judgment for retaliation claims. *Id.* at 644. Under the first method, a plaintiff may present direct evidence that he engaged in protected activity and as a result suffered some adverse employment action. *Id.* If the evidence is uncontradicted, plaintiff is entitled to summary judgment; but if defendant presents unrebutted evidence that it would have take the adverse employment action against plaintiff regardless of any retaliatory motive, defendant would be entitled to summary judgment. *Id.*

Under the second method or the indirect method, an adaptation of *McDonnell Douglas* to the retaliation context, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) he was subjected to adverse employment action, (3) he was performing his job in a satisfactory manner, and (4) he was treated less favorably than any other similarly situated employee who did not engage in such protected activity. *Stone*, 281 F.3d at 644; *Smith v. Allstate Ins. Corp.*, No. 99 C 0906, 2002 WL 485374, at *16 (N.D. Ill. Mar. 29, 2002). If plaintiff establishes a prima facie case of retaliation, the burden then shifts to defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, [it] is entitled to summary judgment. Otherwise there must be a trial." *Stone*, 281 F.3d at 644. Establishing a causal link between the protected expression and adverse employment action is not required under the second method. *Id.*; *McKay v. Town & Country Cadillac, Inc.*, No. 97 C 2102, 2002 WL 664024, at *4 (N.D. Ill. Apr. 23, 2002).

The Seventh Circuit decided *Stone* <u>after</u> Acorn moved for summary judgment, but <u>before</u> Nielsen responded to the motion. In fact, it is clear that Nielsen was aware of *Stone* because she cited to the case in her response. But Nielsen did not present her rebuttal arguments in the framework adopted by *Stone*, but instead used the old test. Nevertheless, the Court will assume, because Nielsen

has not pointed to any direct evidence of a retaliatory motive by Acorn[2], that the indirect *McDonnell Douglas* method articulated in *Stone* applies to her case.

### A. Prima Facie Case

#### 1. Statutorily Protected Activity

For purposes of retaliation claims, statutorily protected activity generally consists of either an employee filing a charge with the EEOC or opposing any practice made unlawful under 42 U.S.C. §2000e-3(a). *See Rizzo v. Sheahan*, 266 F.3d 705, 714-15 (7th Cir. 2001); *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 952 (7th Cir. 2001). It is undisputed that when Nielsen formally complained to Acorn on October 3, 2000, and filed her charge of sexual harassment with the EEOC on October 24, 2000, she was engaging in statutorily protected activity. However, Nielsen contends the complaints about sexual harassment that she made to Danczyk from January to September 2000, and Goldstein in February 2000, also constitute protected activities. The issue that must be decided, then, is whether those complaints were sufficient to put Acorn on notice of Nielsen's sexual harassment claim.

The Court first looks at whether Acorn has designated channels for reporting sexually harassing conduct. *Parkins v. Civil Constructors of Ill. Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998). Where an employer identifies a person to accept these complaints, under normal circumstances, the employee should complain to the designated individual. *Id.* If no person is identified or that person is not easily accessible, notice can still be imputed upon an employer if the employee reasonably believed that he or she complained to someone who is authorized to receive and forward the complaint to the employer. *Id.*

---

[2]*See Fyfe v. City of Fort Wayne*, 241 F.2d 597, 602 (7th Cir. 2001) ("When a plaintiff proceeds under the direct proof method, allegedly discriminatory statements are relevant only if they are both made by the decisionmaker and related to the employment decision at issue."); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) ("Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.").

According to Acorn's written sexual harassment policy, an employee subjected to such harassment should contact "Marianne Malaychuck or any other member of management she/he feels comfortable speaking with." (Pl.'s App. to LR56.1(B) Statement in Opp'n to Def.'s Mot. for Summ. J., Ex. 13). Plaintiff contends her oral and written complaints to Danczyk, her supervisor, were sufficient to impute notice to Acorn, but the Court disagrees. Complaining to Danczyk would not qualify as notice to Acorn because it would be unreasonable to believe Danczyk would forward a complaint of sexual harassment against himself to company management *See Parkins*, 163 F.3d at 1037 (plaintiff's complaint of sexual harassment to foreman against foreman did not impute notice to employer). Other than refraining from the complained of conduct, Danczyk was not in an authorized position to address the problem. Nielsen's complaints to Danczyk, therefore, are not statutorily protected expressions. *See McKay*, 2002 WL 664024, at *10.

The February 2000 letter Nielsen wrote to Goldstein in which she complains about Danczyk sexually harassing her is a different matter, though, since Goldstein, as Acorn's President, was a member of management authorized to investigate such a complaint. Nevertheless, there is some question as to when Goldstein actually saw the letter. Although Nielsen says she gave the letter to Goldstein's personal driver, who also delivered the mail at Acorn, Goldstein denies receiving the letter in February. However, he does admit to having seen it at a later point in time. Exactly how many months later is not clear from his testimony, though. But in light of the fact that all reasonable inferences must be drawn in favor of the nonmoving party when determining whether a genuine issue of material fact exists, the Court will assume that Goldstein received the letter sometime after February. *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir. 1986). Hence, Nielsen engaged in statutorily protected activity in February 2000, and October 2000.

*2. Adverse Employment Action*

A materially adverse employment action may include termination of employment, demotion evidenced by decrease in wages or salary, material loss of benefits, or significantly diminished responsibilities. *Ribando v. United Airlines, Inc.*, 200 F.3d at 507, 511 (7th Cir. 1999). Although adverse employment actions may include more forms of adversity than quantifiable reduction of pay or benefits, minor or trivial actions that make the employee unhappy are not sufficient to qualify. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *McKay*, 2002 WL 664024, at *15. It is undisputed that Nielsen's December 2000 termination qualifies as an adverse action. Nielsen also alleges that after she complained of sexual harassment and filed an EEOC charge, Acorn subjected her to four other adverse employment actions as well.

First, Nielsen contends the September 2000 switch in her work hours from 7:30am-4pm to 8am-4:30pm constitutes an adverse action. However, Nielsen's pay and job title remained the same, and Acorn did not significantly decrease her job responsibilities. Such a minor shift in her work schedule, therefore, does not rise to the level of an adverse employment action.[3] *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001).

Second, Nielsen points to her one-day suspension without pay on October 2, 2000, arguing that it qualifies as an adverse action. In cases involving disciplinary suspensions with a loss of pay ranging from five to nine days, the Seventh Circuit has found an adverse employment action occurred. *See Russell v. Bd. of Trustees of Univ. of Ill. at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001) (collecting cases). But it has not yet considered if a one day suspension is sufficient. *See Tan v. City of Chicago*, No. 00 C 1470, 2001 WL 1012586, at *5 (N.D. Ill. Aug. 30, 2001). Nevertheless, because "the Seventh Circuit has defined 'broadly' what constitutes an adverse employment action," *Id.*, the Court will simply assume

---

[3]Additionally, the Court finds nothing suspicious about Acorn's business justification of wanting switchboard coverage for that additional 30 minute period, even though voicemail was available, as many consumers still prefer talking to a live person.

for the sake of argument that a one-day suspension without pay is sufficient for material adversity.

Next, Nielsen argues that Acorn's change to her workstation on October 9, 2000 was an adverse action. Nielsen claims the new desk was broken-down, smaller and less stable, which made it more difficult for her to do her job. No doubt, the before and after pictures of Nielsen's workstation show a less aesthetically pleasing and cramped work area, but "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience." *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). Other than the discomfort resulting from having having to work in a tighter space, with no privacy, Nielsen has not explained how the changed desk caused any material loss to her. Indeed, while the change may have made her unhappy, her job responsibilities, title and pay remained the same. Thus, the change to her workstation area does not rise to the level of an adverse employment action. *See, e.g., Daniel v. Skudder Kemper Investments, Inc.*, No. 00 C 5961, 2002 WL 1160934, at *6 (N.D. Ill. May 23, 2002) (seat reassignment from window closer to supervisor does not constitute an adverse employment action).

Finally, Nielsen asserts that Goldstein's alleged October 2000 instruction to other employees to avoid her is an adverse action. However, shunning by other employees is not actionable unless Nielsen also shows that she suffered material harm as a result of it, such as a reduction in salary, benefits or responsibilities. *Parkins*, 163 F.3d at 1039. Once again, because Nielsen has not demonstrated any resultant material effect, even if Goldstein did tell employees not to speak with her, his conduct does not qualify as an adverse job action.[4]

---

[4]Nielsen actually concedes that these each action standing alone may not be actionable, but nonetheless argues that when viewed collectively, they all rise to the level of adverse employment actions. In support of this position, Nielsen cites to *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) and *Saxton v. American Tel &Tel Co.*, 10 F.3d 526 (7th Cir. 1993). However, those cases are distinguishable since the courts there considered the totality of circumstances in order to determine if a work environment was hostile and abusive, not whether the plaintiff had been subjected to an adverse employment action. *See Harris*, 510 U.S. at 23; *Saxton*, 10 F.3d at 533-34.

At most, then, Nielsen has identified two adverse employment actions, her one-day suspension, and her termination.

### 3. Performing to Employer's Expectations

Nevertheless, Nielsen has not presented any objective evidence whatsoever to suggest that she was performing according to Acorn's expectations. In fact, the focus of her response brief is on Acorn's alleged retaliatory motive. But to meet her burden of establishing a prima facie case of retaliation, Nielsen must also demonstrate that her work performance was satisfactory. *See Stone*, 281 F.3d at 644. The record reflects that Nielsen was specifically told on August 7, 2000 by Danczyk and Toffler not to do homework at the switchboard during work hours, suspended for one-day without pay on October 2, 2000 by Danczyk for doing homework at her desk and not completing her work assignments, warned again on October 19, 2000 by Hopkins about doing homework at her desk, allegedly seen doing homework at her desk on December 5, 2000 by Donna Quinlan, an Acorn employee who filed an affidavit attesting to that fact, warned once more by Hopkins and Toffler, and allegedly seen again doing homework at her desk on December 7, 2000 by Goldstein, who also submitted an affidavit attesting to that fact.

To create a genuine issue of material fact and thereby defeat summary judgment, Nielsen must "make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] bears the burden of proof at trial." *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 479 (7th Cir. 1996). By not offering any evidence on the issue of her job performance, Nielsen fails to establish a prima facie case of retaliation.

### 4. Treated Less Favorably than Similarly Situated Employee

Moreover, even if Nielsen had demonstrated a satisfactory job performance, she still has not satisfied her burden of showing that she was treated less favorably than a similarly situated employee

who did not engage in statutorily protected activity. *See Stone*, 281 F.3d at 644. Nielsen maintains that Lori Zygaldo, an Acorn employee who occasionally filled in for her at the switchboard during lunchtime, was allowed to read a magazine or do other personal things. However, the Court does not believe Nielsen has established that she and Zygaldo were similarly situated with respect to their performance, qualifications and conduct. *See Radue,* 219 F.3d at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* Because Zygaldo's regular position was not as a switchboard operator, she and Nielsen were not in comparable situations.

### B. *Legitimate Non-discriminatory Reason for Action by Employer*

Finally, even if Nielsen could make out a prima facie case of retaliation, Acorn is still entitled to summary judgment because, as the Court noted above, Nielsen has not offered any evidence to rebut its legitimate non-discriminatory reason for the one-day suspension and termination of her employment. *Stone,* 281 F.3d at 644. Both adverse employment actions resulted from Acorn's belief that Nielsen had continued to do homework at her desk during work hours, even though she had been warned on several occasions not to do so.

Nielsen does deny that she was doing homework at her desk, and maintains that she could have proven this if Acorn management had confronted her with the accusations at the time. In support of her contention, she points only to a letter she wrote to her attorney denying Acorn's allegations. However, an employee's self-serving statements cannot be used to defeat a summary judgment motion. *See Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1303 (7th Cir. 1991) ("[Plaintiff's] own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination.").

According to Acorn's written sexual harassment policy, an employee subjected to such harassment should contact "Marianne Malaychuck or any other member of management she/he feels comfortable speaking with." (Pl.'s App. to LR56.1(B) Statement in Opp'n to Def.'s Mot. for Summ. J., Ex. 13). Plaintiff contends her oral and written complaints to Danczyk, her supervisor, were sufficient to impute notice to Acorn, but the Court disagrees. Complaining to Danczyk would not qualify as notice to Acorn because it would be unreasonable to believe Danczyk would forward a complaint of sexual harassment against himself to company management *See Parkins*, 163 F.3d at 1037 (plaintiff's complaint of sexual harassment to foreman against foreman did not impute notice to employer). Other than refraining from the complained of conduct, Danczyk was not in an authorized position to address the problem. Nielsen's complaints to Danczyk, therefore, are not statutorily protected expressions. *See McKay*, 2002 WL 664024, at *10.

The February 2000 letter Nielsen wrote to Goldstein in which she complains about Danczyk sexually harassing her is a different matter, though, since Goldstein, as Acorn's President, was a member of management authorized to investigate such a complaint. Nevertheless, there is some question as to when Goldstein actually saw the letter. Although Nielsen says she gave the letter to Goldstein's personal driver, who also delivered the mail at Acorn, Goldstein denies receiving the letter in February. However, he does admit to having seen it at a later point in time. Exactly how many months later is not clear from his testimony, though. But in light of the fact that all reasonable inferences must be drawn in favor of the nonmoving party when determining whether a genuine issue of material fact exists, the Court will assume that Goldstein received the letter sometime after February. *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir. 1986). Hence, Nielsen engaged in statutorily protected activity in February 2000, and October 2000.

## 2. *Adverse Employment Action*

A materially adverse employment action may include termination of employment, demotion evidenced by decrease in wages or salary, material loss of benefits, or significantly diminished responsibilities. *Ribando v. United Airlines, Inc.*, 200 F.3d at 507, 511 (7th Cir. 1999). Although adverse employment actions may include more forms of adversity than quantifiable reduction of pay or benefits, minor or trivial actions that make the employee unhappy are not sufficient to qualify. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *McKay*, 2002 WL 664024, at *15. It is undisputed that Nielsen's December 2000 termination qualifies as an adverse action. Nielsen also alleges that after she complained of sexual harassment and filed an EEOC charge, Acorn subjected her to four other adverse employment actions as well.

First, Nielsen contends the September 2000 switch in her work hours from 7:30am-4pm to 8am-4:30pm constitutes an adverse action. However, Nielsen's pay and job title remained the same, and Acorn did not significantly decrease her job responsibilities. Such a minor shift in her work schedule, therefore, does not rise to the level of an adverse employment action.[3] *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001).

Second, Nielsen points to her one-day suspension without pay on October 2, 2000, arguing that it qualifies as an adverse action. In cases involving disciplinary suspensions with a loss of pay ranging from five to nine days, the Seventh Circuit has found an adverse employment action occurred. *See Russell v. Bd. of Trustees of Univ. of Ill. at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001) (collecting cases). But it has not yet considered if a one day suspension is sufficient. *See Tan v. City of Chicago*, No. 00 C 1470, 2001 WL 1012586, at *5 (N.D. Ill. Aug. 30, 2001). Nevertheless, because "the Seventh Circuit has

---

[3]Additionally, the Court finds nothing suspicious about Acorn's business justification of wanting switchboard coverage for that additional 30 minute period, even though voicemail was available, as many consumers still prefer talking to a live person.

defined 'broadly' what constitutes an adverse employment action," *Id.*, the Court will simply assume for the sake of argument that a one-day suspension without pay is sufficient for material adversity.

Next, Nielsen argues that Acorn's change to her workstation on October 9, 2000 was an adverse action. Nielsen claims the new desk was broken-down, smaller and less stable, which made it more difficult for her to do her job. No doubt, the before and after pictures of Nielsen's workstation show a less aesthetically pleasing and cramped work area, but "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience." *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). Other than the discomfort resulting from having having to work in a tighter space, with no privacy, Nielsen has not explained how the changed desk caused any material loss to her. Indeed, while the change may have made her unhappy, her job responsibilities, title and pay remained the same. Thus, the change to her workstation area does not rise to the level of an adverse employment action. *See, e.g., Daniel v. Skudder Kemper Investments, Inc.*, No. 00 C 5961, 2002 WL 1160934, at *6 (N.D. Ill. May 23, 2002) (seat reassignment from window closer to supervisor does not constitute an adverse employment action).

Finally, Nielsen asserts that Goldstein's alleged October 2000 instruction to other employees to avoid her is an adverse action. However, shunning by other employees is not actionable unless Nielsen also shows that she suffered material harm as a result of it, such as a reduction in salary, benefits or responsibilities. *Parkins*, 163 F.3d at 1039. Once again, because Nielsen has not demonstrated any resultant material effect, even if Goldstein did tell employees not to speak with her, his conduct does not qualify as an adverse job action.[4]

---

[4] Nielsen actually concedes that these each action standing alone may not be actionable, but nonetheless argues that when viewed collectively, they all rise to the level of adverse employment actions. In support of this position, Nielsen cites to *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) and *Saxton v. American Tel &Tel Co.*, 10 F.3d 526 (7th Cir. 1993). However, those cases are distinguishable since the courts there considered the totality of circumstances in order to determine if a work environment was

At most, then, Nielsen has identified two adverse employment actions, her one-day suspension, and her termination.

### 3. Performing to Employer's Expectations

Nevertheless, Nielsen has not presented any objective evidence whatsoever to suggest that she was performing according to Acorn's expectations. In fact, the focus of her response brief is on Acorn's alleged retaliatory motive. But to meet her burden of establishing a prima facie case of retaliation, Nielsen must also demonstrate that her work performance was satisfactory. *See Stone*, 281 F.3d at 644. The record reflects that Nielsen was specifically told on August 7, 2000 by Danczyk and Toffler not to do homework at the switchboard during work hours, suspended for one-day without pay on October 2, 2000 by Danczyk for doing homework at her desk and not completing her work assignments, warned again on October 19, 2000 by Hopkins about doing homework at her desk, allegedly seen doing homework at her desk on December 5, 2000 by Donna Quinlan, an Acorn employee who filed an affidavit attesting to that fact, warned once more by Hopkins and Toffler, and allegedly seen again doing homework at her desk on December 7, 2000 by Goldstein, who also submitted an affidavit attesting to that fact.

To create a genuine issue of material fact and thereby defeat summary judgment, Nielsen must "make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] bears the burden of proof at trial." *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 479 (7th Cir. 1996). By not offering any evidence on the issue of her job performance, Nielsen fails to establish a prima facie case of retaliation.

### 4. Treated Less Favorably than Similarly Situated Employee

---

hostile and abusive, not whether the plaintiff had been subjected to an adverse employment action. *See Harris*, 510 U.S. at 23; *Saxton*, 10 F.3d at 533-34.

Moreover, even if Nielsen had demonstrated a satisfactory job performance, she still has not satisfied her burden of showing that she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. *See Stone*, 281 F.3d at 644. Nielsen maintains that Lori Zygaldo, an Acorn employee who occasionally filled in for her at the switchboard during lunchtime, was allowed to read a magazine or do other personal things. However, the Court does not believe Nielsen has established that she and Zygaldo were similarly situated with respect to their performance, qualifications and conduct. *See Radue*, 219 F.3d at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* Because Zygaldo's regular position was not as a switchboard operator, she and Nielsen were not in comparable situations.

### B. *Legitimate Non-discriminatory Reason for Action by Employer*

Finally, even if Nielsen could make out a prima facie case of retaliation, Acorn is still entitled to summary judgment because, as the Court noted above, Nielsen has not offered any evidence to rebut its legitimate non-discriminatory reason for the one-day suspension and termination of her employment. *Stone*, 281 F.3d at 644. Both adverse employment actions resulted from Acorn's belief that Nielsen had continued to do homework at her desk during work hours, even though she had been warned on several occasions not to do so.

Nielsen does deny that she was doing homework at her desk, and maintains that she could have proven this if Acorn management had confronted her with the accusations at the time. In support of her contention, she points only to a letter she wrote to her attorney denying Acorn's allegations. However, an employee's self-serving statements cannot be used to defeat a summary judgment motion. *See Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1303 (7th Cir. 1991) ("[Plaintiff's] own self-

serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination.").

Moreover, the Court's concern is with whether Acorn honestly believed Nielsen was doing her homework during work hours. *See, e.g., Essex v. United Parcel Serv.*, 111 F.3d 1304, 1310 (7th Cir. 1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proferred explanation is pretextual."). Nielsen has not presented any evidence to suggest that Acorn harbored a dishonest motive when the company suspended her, and then subsequently terminated her employment, for continuing to engage in conduct that she had been told was prohibited. As such, she has not shown that genuine issues of material fact exist that warrant a trial. *See Stone*, 281 F.3d at 644.

## CONCLUSION

For all of the foregoing reasons, this Court finds that Acorn is entitled to summary judgment on Nielsen's claims.

**IT IS SO ORDERED.**

WILLIAM J. HIBBLER, DISTRICT JUDGE

DATED: August 14, 2002